## SMITH *v.* THE STATE.

Under the evidence in this case the verdict of guilty was unauthorized, and a new trial is granted upon that ground.
NOVEMBER 15, 1916.

Indictment for rape. Before Judge Hill. Fulton superior court. July 22, 1916.

Boyce Smith was tried for the offense of rape. The female upon whom the alleged crime was perpetrated was a child ten years old, Evelyn Denson. She was sworn as a witness for the State, and testified, in substance: She had known the defendant for a long time. She and two other little girls went down to a ditch de-

scribed in her testimony, to get some switches to play with, and the prisoner came running down there. He was not seen until he went down to the ditch. When he came down the other little girls, companions of the witness, went home. The defendant proposed sexual intercourse. He then threw witness down. After he threw her down, he threatened to kill her. This was just back of an empty house where no one lived. No one was in sight at the time. The ditch was deep enough to hide in. When he left her there was on her dress a little blood that came from her privates. When he threw her down he hurt her in her privates, and he laid himself on her. He unbuttoned his pants in front; and then (witness added): "He didn't do nothing with his privates. He did not take his privates out. He did not take any of his person out of his breeches when he unbuttoned them. After he threw me down in the ditch, and before that blood got on my dress, he scratched me with his hand. After he unbuttoned his breeches he didn't do nothing to me. This happened just one time. He never took anything out of his breeches here. After he threw me down I was lying down in the ditch. When I was down and he was lying down he hurt me some way. He hurt me with his hand. He did not hurt me with anything else. He did not take his thing out of his breeches. He wanted me to lay down, and I didn't do it. He caught hold of my arm to throw me down. That was after he spoke to me. He never did that to me what I told the jury he said. After we was down he didn't try to do nothing to me. After he threw me down he didn't do nothing to my clothes. He didn't pull my clothes open. He did not put anything in my privates. He scratched me down here (indicating). He never put anything in me. . . It is a fact my mother told me to tell this on Boyce Smith. I told in police court when I was there that my mother told me to tell the judge that Boyce Smith told me he was going to kill me. My mother told me that. Boyce never did tell me that. Boyce Smith talked to me when we lived down on the corner. He never talked to me down in that ditch there. The ditch I am talking about runs along back of Ethel Street. I was in the ditch back of that house. . There is about four or five houses there. . . He throwed me down and crawled over me. He did not put his knees in the mud there; he put them on me; he put his knees over me. He

put his knees right down there; his clothes never touched the ground, no part of them. . . The little girls stayed there just a few minutes after he come. I had on a white dress and petticoat that day, and I had drawers on too. There was no blood on my drawers. My drawers were under my petticoat and dress. He opened my drawers on the side here. I never hollered or screamed. I just went on playing after that, and I played right along till my mother called me to go to the store; and then I went home, and them two little girls went home with me. They went on to their home and they went back with me to my home. They went with me from the ditch to my home together. My mother called me and told me she wanted me to go to the store. I never told her anything about Boyce at that time. Then my mother asked me questions. She asked me a whole lot of questions, and I said yes to all she asked me. I never told her anything I claimed Boyce did to me. I just answered her questions. I did not go to the store; she went herself. She carried me over to Mrs. Moore's. I played right along around there. I have never been sick from that. I know Boyce's sister. I seen her the day this happened, and she asked me what Boyce had done to me, and I told her he hadn't done anything to me. . . This took place in the morning; it was after breakfast; it was 12 o'clock. I don't know what time it was."

Dr. Paul Stegall, a witness sworn for the State, testified that he made an examination of the girl, Evelyn Denson, about the first of June. The crime was alleged to have been committed on the first day of June. He was called to her home, and examined her private parts. He found a slight bruise about the size of a quarter in her left groin, about an inch or inch and a half to the left of the labia majora (the outer lip of the vulva). This was slightly irritated; the labia minora (the inner lip) was a little more irritated; the walls of the vagina more irritated. The hymen was very much irritated, showing that it had recently been ruptured, and the edges were exuding semen. He would not say he found evidence of male semen. That would take a microscopic examination, which he made, but it was not a very thorough examination. There was no evidence of spermatozoa. He tore off a piece of her dress, took it to his office, and examined it that night. The matter which he examined had dried. He could not

say that it was semen. There was no spermatozoa in the specimen he examined. He could not say what ruptured the hymen and irritated the vagina in this instance. The rupture could not have been but a few hours previous. The cause of the irritation and the rupture was the passing of something into the vagina; it could have been done by a man's penis or a person's finger. Something had passed into the vagina to cause the rupture.

Carrie M. Denson, the mother of the girl, testified, identifying the clothes the girl wore, and stating that the spot was not on them when she left the house, which was about 11 o'clock. When the girl came home she said nothing about the occurrence until witness asked her what was the matter. She looked scared and trembling. She told witness that the accused hurt her. This was about 12 o'clock. Witness made an examination of the girl's private parts, and found some blood still coming from them. The girl told her that the defendant threw her down and hurt her some way. That was about all she told her. She did not complain of having any pain. She had never been to school. Witness discovered there was something the matter with her the moment she entered the house. This aroused suspicion, and witness questioned the child. The other little girls came back with her. Witness further described the surroundings—the ditch and other houses near. Her feelings towards the defendant and his family were kindly.

Dr. Battey, a practicing physician, introduced by the defendant, testified: "You could not identify human semen with the naked eye after it had been on a dress for four or five hours; you could with the aid of a microscope. I don't think such identification could be made two or three months later. If a little child ten years of age was assaulted and the vagina entered and hymen lacerated, and vagina irritated, and the labia minora and majora badly irritated, she would suffer so much when the assault was made that I think she would scream and make an outcry. I think a child in that condition would be sufficiently hurt to prevent her from playing. The nervous shock would be very great, especially if she was not a party to it; and also, if she had the condition you have described, she would not be able to play about." Other witnesses for the defendant testified that there was no sign of any struggle in the ditch. There was testimony of the good character of the accused. On the day when the crime was alleged to have been

committed witnesses saw the girl in the afternoon, and she was playing around. The defendant in his statement denied that he had been at the place where the crime was said to have been committed, and denied that he had done anything to the girl or had assaulted her in any way.

The jury returned a verdict of guilty, with a recommendation.

*Albert Kemper,* for plaintiff in error.

*Clifford Walker,* attorney-general, *Eb. T. Williams,* solicitor-general, *A. L. Ivey,* and *Mark Bolding,* contra.

BECK, J. (After stating the facts.) We feel constrained, after a careful consideration of the evidence, to reverse the judgment of the court below denying a new trial, because in our opinion the evidence did not authorize the verdict of guilty. The exact age of the accused is not stated. It is inferable, however, that he was a boy, because the girl, who was but ten years of age, alludes to him as Boyce, calling him by his first name, and other witnesses who testified referred to him as "this boy." The girl herself, upon whom the detestable crime is alleged to have been committed, testified that her private parts were not penetrated by the male organ. In fact she repeatedly denied that there was any attempt to perfect an entrance with the male organ. While she testified that he unbuttoned his breeches, she repeatedly stated that he did not take anything out of his breeches after he unbuttoned them, and she swore positively that the injuries which he inflicted upon her were inflicted with the hand. Of course it may be true that shame upon her part would cause her to deny that the injuries to the vagina had been caused by the penetration of the male organ of the assailant. Nevertheless she swore positively that she was not thus penetrated; that the injuries were inflicted by the hand of her assailant. With this positive testimony before the jury, denying that her private parts had been penetrated by the male organ, and denying that such an effort was made, the proof of penetration which is essential to the crime of rape depended upon circumstantial evidence entirely. There was a rupture of the hymen; this was a strong circumstance against the accused. But the rule is, in cases depending upon circumstantial evidence, that the evidence must be so strong, in order to authorize a conviction, that it excludes every other reasonable hypothesis than that of the defendant's guilt. The physician who examined the girl's private parts,

and who examined certain stains upon the clothes, testified that while his examination was not very thorough, it did not reveal any indications of semen of the male. There was other evidence to negative the theory of rape in this case,—the proximity of houses; the presence of two other little girls at the time the boy came there, to say nothing as to the boy's good character. Questions of fact, we know, are for solution by the jury. But where, as in this case, the positive testimony of the only person who had actual knowledge of the facts essential to the crime of rape negatives the existence of those facts, and where the circumstances as strongly support the hypothesis of innocence as they do the hypothesis of guilt, it can not be said that a verdict of guilty was authorized.

*Judgment reversed. All the Justices concur.*